UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REKAL COMPANY, INC.,

        Plaintiff,

v.                          Case No. 8:13-cv-1433-T-33TGW

PGT INDUSTRIES, INC.,

        Defendant.
_____/

## ORDER

This matter comes before the Court pursuant to PGT Industries Inc.'s Motion to Dismiss (Doc. # 42), filed August 6, 2013. Plaintiff Rekal Company, Inc., filed a Memorandum in Opposition (Doc. # 53) on August 22, 2013. For the reasons that follow, the Court grants the Motion to Dismiss as to Counts I, II, and IV, and denies the Motion as to Count III.[1]

## I.  Factual Background

The Defendant, PGT Industries, Inc., is a Florida Corporation with its principal place of business in North Venice, Florida. (Doc. # 40 at ¶ 2). PGT manufactures and

---

[1] On September 23, 2013, Rekal voluntarily dismissed Count V. (Doc. # 65). Accordingly, the Court declines to address PGT's arguments concerning Count V. Those arguments are now moot.

distributes custom doors, windows, and enclosure systems. (Id. at 2). PGT is the owner of the registered trademark EZE-BREEZE. (Doc. # 40-5 at 6-8).

Rekal is a "small, family owned and operated" business located in Hull, Georgia. (Doc. # 40 at ¶ 1). On May 15, 2009, PGT notified Rekal that it "met the standards required of a PGT Industries distributor for the purchase and distribution of our many fine product lines." (Doc. # 40-1 at 2).

In connection with its distribution of PGT's products, Rekal signed PGT's "Domestic Terms and Conditions of Sale" ("Terms and Conditions") (Doc. # 40-2). PGT's Terms and Conditions state:

> Your order is binding only when accepted, orally, electronically, or in writing at our offices in Venice, Florida. These terms and conditions are the only terms and conditions that apply to your order. Our acceptance of your order is conditioned upon your agreement with these terms and conditions. We reject any terms and conditions in your order, which are different from or additional to these terms and conditions or any changes to the order after acceptance, unless approved by our authorized representative.

(Doc. # 40-2 at ¶ 1.2). Further, under the heading of "Price and Payment," the Terms and Conditions provide:

> Your order shall be deemed a representation that you are solvent and able to pay for the items ordered. If you fail to make payments when due,

> or if bankruptcy or insolvency proceedings are instituted by or against you, or if you make an assignment for the benefit of creditors, you will be deemed in default and we will have the right to terminate our obligations by written notice to you, but such termination will not affect your obligation to pay for items delivered and work in progress.

(Doc. # 40-2 at ¶ 2.4).

Rekal developed and implemented a system for online, direct to consumer sales of PGT's Eze-Breeze products (Doc. # 40 at ¶¶ 4, 5). Rekal alleges that it built its online sales program "from the ground up," and it purchased the "ezebreeze.com" domain name and other related domain names with PGT's "blessing." (Id. at ¶ 5). Rekal further contends that its online system has generated more than $2 million in sales during its first four years as a distributor of the Eze-Breeze products, and "a number of other authorized distributors of PGT have literally 'copied' Rekal's business model." (Id. at ¶¶ 7, 8).

In October 2012, PGT accused Rekal of trademark infringement and demanded that Rekal "turn over" all domain names containing the terms "ezebreeze" and "eze-breeze." (Id. ¶ 12). The parties did not resolve the dispute, and counsel for PGT sent a cease and desist letter to Rekal on

April 19, 2013. (Doc. # 40-5).  The letter stated, in

pertinent part:

> [O]ur client must take action to stop this
> continued infringing use of its EZE-BREEZE® mark
> and misrepresentation to the public, and must
> demand that your company immediately (1) cease
> any and all infringing trademark use in commerce
> of the EZE-BREEZE® mark, (2) immediately remove
> and/or correct any infringing trademark use of
> the EZE-BREEZE® mark on your website and any
> other marketing/promotional materials, and (3)
> transfer the domain name www.ezebreeze.com, and
> any other domain name containing the federally
> registered trademark EZE-BREEZE® to our client.
> While our client has no objection with your
> ability to advertise authentic or legitimate EZE-
> BREEZE® goods on Rekal-owned websites, the
> dispute concerns your efforts to falsely
> misrepresent yourself as the owner of the EZE-
> BREEZE® brand by operating websites located at
> such URLS as www.ezebreeze.com, www.ezebreeze.net,
> and www.eze-breeze.net, identifying your company
> as Eze-Breeze Do It Yourself Porch Enclosures,
> and the inclusion of other misleading language
> appearing on the site.
>
> ...
>
> Finally, because our client cannot continue to do
> business with a company that actively infringes
> its EZE-BREEZE® trademark and continues to
> deceive consumers through false representations
> that it is EZE-BREEZE (or that it is the owner of
> the EZE-BREEZE® trademark) via its internet
> marketing, PGT hereby provides notice that it
> shall discontinue sales of all PGT products to
> Rekal, thirty (30) days from today.  This
> reasonable 30 day notice is provided to ensure
> your company has sufficient time to source goods
> from alternative suppliers.  While it is
> unfortunate that PGT must resort to discontinuing
> sales, it cannot continue to sell to a company

that actively infringes the valuable intellectual
property that it has worked so hard to develop.

(<u>Id.</u> at 3-5).

On May 7, 2013, Rekal responded to the cease and
desist letter, denying "any violation of the 'Eze-Breeze'
registered trade-mark or any other alleged wrong doing or
damage" to PGT. (Doc. # 40-6 at 2).  Rekal also set forth
its potential claims against PGT and proposed options for
settling the parties' dispute. (Doc. # 40 at ¶ 14).

Subsequently, on May 20, 2013, Rekal's sales director,
Sean Laker, attempted to place an order with PGT and was
told that Rekal's account had been placed on hold. (Doc. #
40 at ¶ 16).  Rekal was advised, through counsel, that it
could resume selling Eze-Breeze products if it relinquished
the pertinent domain names to PGT. (<u>Id.</u> at ¶ 17).  Rekal
declined this offer. (<u>Id.</u>).

As a result of PGT's hold on its account, Rekal sought
out alternative suppliers and products. (<u>Id.</u> at ¶ 23).
However, on July 8, 2013, S-Tek, a distributor of PGT,
notified Laker that PGT would no longer allow S-Tek to
provide Eze-Breeze products to Rekal. (<u>Id.</u>).

## II.  **Procedural History**

Rekal commenced this action against PGT and JLL Partners, Inc. in the United States District Court for the Middle District of Georgia on May 24, 2013. (Doc. # 1). The Complaint alleged breach of contract, detrimental reliance, fraud in the inducement, extortion, intentional interference with prospective business, and reverse domain name hijacking. Id.

On May 30, 2013, PGT and JLL Partners, Inc. responded, arguing, among other things, that venue was not proper in the Middle District of Georgia based on a forum-selection clause in PGT's Terms and Conditions. (Doc. # 8). Because Rekal "failed to rebut the presumptive validity of the forum selection clause," the action was transferred to this Court. (Doc. # 11 at 3).

At Rekal's request, (Doc. # 32), JLL Partners, Inc., was dismissed from this action without prejudice on July 9, 2013. (Doc. # 33). Thereafter, with the Court's permission, (Doc. # 39), Rekal filed a Second Amended Complaint. (Doc. # 40). The Second Amended Complaint contains the following counts: breach of contract (Count I), equitable estoppel based on detrimental reliance (Count II), declaratory judgment (Count III), and tortious interference with a

prospective business relationship (Count IV). (Id.).   PGT
seeks dismissal of each count of the Second Amended
Complaint. (Doc. # 42).

## III. Legal Standard

     In deciding a motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), the Court accepts as true
all of the allegations of the complaint and construes them
"in the light most favorable to the plaintiff."   United
Techs. Corp. v. Mazer, 556 F.3d 1260, 1269 (11th Cir. 2009).
All that is required is "a short and plain statement of the
claim" pursuant to Fed. R. Civ. P. 8(a)(2). Bell Atl. Corp.
v. Twombly, 550 U.S. 544, 555 (2007)(citing Conley v.
Gibson, 355 U.S. 41, 47 (1957)).

     A complaint that offers "labels and conclusions, and a
formulaic recitation of the elements of a cause of action
will not do."   Twombly, 550 U.S. at 555.   "Factual
allegations must be enough to raise a right to relief above
the speculative level on the assumption that all the
allegations in the complaint are true."   Id.

     In order to survive a motion to dismiss, "the
complaint's allegations must plausibly suggest that the
plaintiff has a right to relief, raising that possibility
above a speculative level; if they do not, the plaintiff's

complaint should be dismissed." <u>James River Ins. Co. v. Ground Down Eng'g, Inc.</u>, 540 F.3d 1270, 1274 (11th Cir. 2008)(internal citation and quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).

**IV.  <u>Analysis</u>**

**A.   <u>Count I – Breach of Contract</u>**

Rekal's allegation that PGT breached the contract between them turns on whether an enforceable contract exists at all.  "It is a fundamental principle of contract law that a promise must be supported by consideration to be enforceable." <u>Office Pavilion S. Fla., Inc. v. ASAL Prods., Inc.</u>, 849 So. 2d 367, 370 (Fla. 4th DCA 2003).  Under Florida law, when a promise "appears on its face to be so insubstantial as to impose no obligation at all on the promisor — who says, in effect, 'I will if I want to' — then that promise may be characterized as an 'illusory promise,' i.e., 'a promise in form but not in substance.'" <u>Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.</u>, 162 F.3d 1290, 1311 (11th Cir. 1998)(internal citation omitted).

In a contract where the parties exchange promises of performance, "[i]f either of those promises is illusory or unenforceable then there is no consideration for the other promise." Allington Towers N., Inc. v. Rubin, 400 So. 2d 86, 87 (Fla. 4th DCA 1981). "Where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound." Rosenberg v. Lawrence, 541 So. 2d 1204, 1206 (Fla. 3d DCA 1988) (citing Miami Coca-Cola Bottling Co. v. Orange-Crush Co., 291 F. 102 (S.D. Fla. 1923)).

Rekal argues that two documents form a contract between itself and PGT: (1) the May 15, 2009 letter from PGT to Rekal (Doc. # 40-1) (2) and the Terms and Conditions (Doc. # 40-2). The Court finds, however, that these two do not comprise an enforceable contract, as they obligate neither side to act. As previously noted, the Terms and Conditions state:

> Your order is binding only when accepted, orally, electronically, or in writing at our offices in Venice, Florida. These terms and conditions are the only terms and conditions that apply to your order. Our acceptance of your order is conditioned upon your agreement with these terms and conditions. We reject any terms and conditions in your order, which are different from or additional to these terms and conditions

> or any changes to the order after acceptance,
> unless approved by our authorized representative."

(Doc. # 40-2 at ¶ 1.2).   At no point do the Terms and Conditions specify any obligation on the part of either party sufficient to create an enforceable contract — not a minimum number of units to be ordered, a minimum duration of exclusivity, nor a fixed price at which goods can be purchased.   Rather, the Terms and Conditions specifically reserve PGT's right to refuse any orders placed by Rekal, orders Rekal itself was under no obligation to place. Except during the periods of time between PGT's acceptance of orders and the performance of the duties created under the ensuing contracts, PGT and Rekal were both free to walk away from the relationship at any time.[2]

Rekal compares the instant case to <u>Britt Green Trucking v. FedEx Nat. LTL, Inc.</u>, 511 F. App'x 848, 851 (11th Cir. 2013), where the Eleventh Circuit held that the "consideration required to support a contract need not be money or anything having monetary value, but may consist of either a benefit to the promisor or a detriment to the

---

[2] Likewise, the May 15, 2009, letter does nothing more than inform Rekal that it "met the standards required of a PGT industries distributor." (Doc. # 40-1).   That letter also provided Rekal with distributor number and provided general information about PGT's distributor system.

promisee." Here, however, the Terms and Conditions necessitate neither benefit nor detriment to either party.

In Britt Green, FedEx and Britt Green signed an agreement stating that the latter would "provide transportation services, as needed," to the former so long as "[FedEx] or its customers; and [Britt Green] desire[d] to contract with [FedEx] to transport such commodities." Id. at 850. In addition, however, the contract contained several provisions imposing a benefit or detriment on one or both parties regardless of whether they reached agreement on individual deliveries: Britt Green was required "to pay into an escrow fund controlled by FedEx, wear FedEx uniforms, maintain their trucks with FedEx signs and permits, and provide written notice to FedEx before performing transportation services for other carriers"; and any written notice was to be "delivered in person, mailed by certified mail, or sent by FedEx Express Service to FedEx's Orlando address." Id.

The Terms and Conditions here contain no comparable provisions. The Terms and Conditions govern only matters directly contingent upon future, hypothetical transactions between Rekal and PGT, matters such as risk of loss (Doc. # 40-2 at ¶ 1.3), rejection of goods (Id. at ¶ 3.3), and

indemnification (Id. at ¶ 4.2).  Furthermore, the contract in Britt Green contained a provision explicitly designating the "mutual covenants and agreements contained" in the contract as consideration. (Id. at 851).  The Terms and Conditions contain no such provision.

The case at hand is more analogous to Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290 (11th Cir. 1998).  There, the parties agreed for Telestat to provide cable construction work to JEJ for an indefinite period. (Id. at 1297).  The alleged contract granted JEJ the right of first refusal before Telestat was free to offer any such work to other contractors. (Id.) The Eleventh Circuit held that JEJ's right to reject Telestat's offers of work rendered the contract's "guarantee" to JEJ of a particular number of miles of cable installation work unenforceable for lack of consideration. See (Id. at 1299).  Due to the "right of first refusal" provision, the contract "placed no obligation on JEJ in terms of either quantity of work performed or price charged for such work," thus "mak[ing] clear that JEJ could turn down every offer from Telestat, and thus do no work whatsoever." (Id. at 1312).  As such, the contract was unenforceable and "had no more legal effect than an

-12-

unsigned piece of paper indicating that the parties intended to enter into a series of construction contracts that would incorporate by reference some of the provisions appearing on the paper." (Id. at 1313).

Here, the Terms and Conditions provide a framework for the parties to use should (1) Rekal make an offer by placing an order specifying a number of units to be purchased and (2) PGT accept, given its discretion to refuse any order that was placed. Like the alleged contract in Johnson Enterprises, the Terms and Conditions were to be incorporated by reference into any contract formed by the parties governing an individual transaction. In sum, the Terms and Conditions do not constitute a contract.

Rekal's failure to identify an enforceable contract warrants an Order granting PGT's motion to dismiss as to Count I. See Office Pavilion S. Fla., Inc., 849 So. 2d at 370-71 (finding that an arrangement to purchase chairs was unenforceable for lack of consideration where alleged contract contained no unit or price term); Allington Towers N., Inc. v. Rubin, 400 So. 2d 86, 87-88 (Fla. 4th DCA 1981) (holding a purchase agreement unenforceable as lacking mutuality of obligation and mutuality of remedy).

Furthermore, as articulated by the Honorable Thomas G. Wilson, United States Magistrate Judge, in his Report and Recommendation (Doc. # 59), even if the Terms and Conditions constituted an enforceable contract, Rekal's arguments concerning a breach thereof are internally inconsistent.[3] Rekal alleges that, under paragraph 2.4 of the Terms and Conditions, "PGT could only terminate for failure of payment, insolvency or where Rekal otherwise made assignments to creditors." (Doc. # 40 at ¶ 30). At the same time, Rekal maintains that "PGT has never advised Rekal that it has terminated Rekal's distributorship." (Id. at ¶ 24). The latter claim renders the former, already dubious argument, even weaker: if PGT has never terminated its relationship with Rekal, then paragraph 2.4, as interpreted by Rekal, has not been implicated at all. Thus, the Court grants PGT's motion to dismiss as to Count I.

---

[3]    This Court adopted Judge Wilson's Report and Recommendation by denying Rekal's Motion for Preliminary Injunction on September 24, 2013. (Doc. # 67).

**B.**   **Count II – Promissory Estoppel**

The basic elements of promissory estoppel are set
forth in RESTATEMENT (SECOND) OF CONTRACTS, § 90 (1979), which
states:

> A promise which the promisor should reasonably
> expect to induce action or forbearance on the
> part of the promisee or a third person and which
> does induce such action or forbearance is binding
> if injustice can be avoided only by enforcement
> of the promise.   The remedy granted for breach
> may be limited as justice requires.

The character of the reliance protected is explained as
follows:

> The promisor is affected only by reliance which
> he does or should foresee, and enforcement must
> be necessary to avoid injustice.   Satisfaction of
> the latter requirement may depend on the
> reasonableness of the promisee's reliance, on its
> definite and substantial character in relation to
> the remedy sought, on the formality with which
> the promise is made, on the extent to which the
> evidentiary, cautionary, deterrent, and
> channeling functions of form are met by the
> commercial setting or otherwise, and on the
> extent to which such other policies as the
> enforcement of bargains and the prevention of
> unjust enrichment are relevant.

Id.; see also Escarra v. Regions Bank, 353 F. App'x 401,
403 (11th Cir. 2009). Promissory estoppel does not apply in
situations where a promise is not "sufficiently definite in
time or term or reasonableness." See W.R. Grace and Co. v.
Geodata Servs., Inc., 547 So. 2d 919, 925 (Fla. 1989).   A

promise "*entirely* indefinite as to terms and time" does not entitle the promise to enforcement by way of promissory estoppel. See (Id. at 924) (quoting Hygema v. Markley, 187 So. 373, 380 (Fla. 1939)) (emphasis added).

Here, Rekal alleges that it relied to its detriment on a promise made by PGT that it would continue to supply Rekal with an unspecified number of goods for an unspecified period of time. (Doc. # 40 at ¶¶ 36-38).  Such an alleged promise is entirely indefinite as to terms and time, and therefore may not be enforced by promissory estoppel.

Rekal also alleges that, in an e-mail from PGT Vice President Debra LaPinska dated April 15, 2011, Ms. LaPinska represented that the domain "ezebreeze.com" was "not the domain name that PGT uses for Eze-Breeze" and that, in reliance on the representation, Rekal purchased the domain name for itself. (Doc. # 53 at 11). "[A] truthful statement as to the present intention of a party with regard to his future act" cannot support a claim for promissory estoppel. W.R. Grace & Co., 547 So. 2d at 924 (quoting S. Inv. Corp. v. Norton, 57 So. 2d 1 (Fla. 1952)).

The portion of Ms. LaPinska's e-mail concerning the domain name ezebreeze.com reads in full: "The domain name

that was presented to you is not the domain name that PGT uses for Eze-Breeze.   I appreciate you bringing this forward, however I don't believe we need to purchase this domain name." (Doc. # 40-3 at 2).

The e-mail in question states nothing beyond PGT's present disinclination to purchase the domain name.   Ms. LaPinska makes no formal or affirmative representation as to whether PGT consented to Rekal purchasing the domain name itself.   Rekal's reliance on such an indefinite and insubstantial statement lacks the reasonableness required to demonstrate that enforcement of the statement is necessary to avoid injustice.   PGT's motion to dismiss is therefore granted as to Count II.

### C.   Count III – Declaratory Judgment

In a letter dated April 19, 2013, PGT alleged that Rekal, through its use of PGT's registered trademark EZE-BREEZE, violated PGT's trademark rights under 15 U.S.C. § 1125. (Doc. # 40-5).   In Count III, Rekal requests a declaratory judgment that it has not violated PGT's trademark rights. (Doc. # 40 at ¶ 49).

In the instance that PGT were to bring an action against Rekal for trademark infringement under 15 U.S.C. § 1125, PGT would be required to "show (1) that it had

prior rights in its mark or name and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." E.g., Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 360 (11th Cir. 1997).

Among other arguments, Rekal asserts that any claim for trademark infringement brought by PGT would be barred by the doctrine of laches.  To assert the defense of laches, Rekal must show "(1) a delay [on the part of PGT] in asserting a right or claim; (2) that the delay was not excusable; and (3) that the delay caused [Rekal] undue prejudice." See Am. Historic Racing Motorcycle Ass'n, Ltd. v. Team Obsolete Promotions, 33 F. Supp. 2d 1000, 1007 (M.D. Fla. 1998).

Assuming the truth of Rekal's allegation that "PGT at all times from inception, knew and acquiesced in Rekal's use of" the domain names in question, Rekal would appear to have a viable laches defense.  If so, could be entitled to the declaratory relief requested.  As such, at this preliminary juncture, the motion to dismiss is denied as to Count III.

-18-

   **D.   Count IV - Tortious Interference with a Business
         Relationship**

   Rekal alleges that PGT tortiously interfered with
Rekal's business relationship with S-Tek Building Solutions,
LLC. (Doc. # 40 at ¶¶ 23, 51). The elements comprising
the tort of interference with a business relationship are:
(1) the existence of a business relationship that affords
the plaintiff existing or prospective legal rights; (2)
defendant's knowledge of the business relationship; (3) the
defendant's intentional and unjustified interference with
the relationship; and (4) damage to the plaintiff." Int'l
Sales & Serv. v. Austral Insulated Prods., 262 F.3d 1152,
1154 (11th Cir. 2001)(citing Ethan Allen, Inc. v.
Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994)).

   As to the first element, a business relationship that
affords the plaintiff existing or prospective legal rights,
such relationship "may exist without the presence of an
actual enforceable contract." Lake Gateway Motor Inn, Inc.
v. Matt's Sunshine Gift Shops, Inc., 361 So. 2d 769, 771-72
(Fla. 4th DCA 1978). To find the existence of such a
relationship, the jury need only find that "an
understanding between the parties would have been completed
had the defendant not interfered." Landry v. Hornstein, 462

-19-

So. 2d 844, 846 (Fla. 3d DCA 1985). The understanding, however, must be such that parties have "some attendant legal rights." <u>Lake Gateway</u>, 361 So. 2d at 772.

The Second Amended Complaint indicates only that, on June 28, 2013, PGT sent a letter to S-Tek instructing it to discontinue sales of EZE-BREEZE products to Rekal. (Doc. # 40 at ¶ 23). The Second Amended Complaint also rather vaguely states that Rekal "made arrangements" with "other distributors" to purchase PGT products once PGT refused to directly furnish them to Rekal. (<u>Id.</u>). The Second Amended Complaint leaves unstated whether S-Tek was one such "other distributor," or whether and how the "arrangements" set up between Rekal and S-Tek bestowed attendant legal rights upon the parties sufficient to form a valid business relationship.

As stated previously, a complaint that offers only "labels and conclusions, [or] a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555. Factually, Rekal fails to allege enough to establish the existence of a business relationship.

Assuming, however, that a business relationship did exist between Rekal and S-Tek, the Second Amended Complaint alleges facts sufficient to support a finding that PGT knew

of its existence and intentionally interfered with such relationship. This is because PGT sent S-Tek a letter warning S-Tek that it should not sell any products to Rekal. The letter evinces Rekal's awareness of a possible relationship between Rekal and S-Tek.

Rekal's Second Amended Complaint does satisfy the fourth element of the tort, alleging damages "including but not limited to Rekal's immediate loss of revenues and good will with the consumers to whom Rekal sells and the industry in which Rekal does business." (Doc. # 40 at ¶ 56). Nevertheless, due to the Second Amended Complaint's deficiency, as outlined above, Rekal fails to state a claim for tortious interference with a business relationship. As such, PGT's motion to dismiss is granted as to Count IV.

**V.   Conclusion**

As discussed above, the Court determines that Count I, for breach of contract, Count II, for promissory estoppel, and Count IV, for tortious interference with a business relationship, are subject to dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, in an abundance of fairness to Rekal, the Court determines that it is appropriate to allow Rekal to file a Third Amended Complaint to cure the deficiencies identified by

the Court, if Rekal so chooses.  Rekal may file such Third Amended Complaint by October 9, 2013.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  PGT Industries, Inc.'s Motion to Dismiss (Doc. # 42) is **GRANTED** as to Counts I, II, and IV and is **DENIED** as to Count III.

(2)  Rekal Company, Inc. may file a Third Amended Complaint on or before October 9, 2013, if it so chooses.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 30th day of September, 2013.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies to: All Counsel of Record